May it please the Court and Council, if I could reserve two minutes for rebuttal, my name is David Jabbam and I represent Jamie Head. I'll begin with an apology. If I sound funny I've got this sinus thing that apparently is gripping half the Midwest so I apologize for that. We are here today on a case that is back on remand from this court. It's called the commission decision where you had requested that the commission explain why they had reversed a wage differential and made it a perm partial and essentially you wanted them to show their work. So unfortunately the commission decision that came back appears to be equally as confusing as they appear to be confusing the vocational person's role with that of the medical doctor in determining the permanent work restrictions. Here's a quick rundown of the case. October 13, 2006, Jamie has his right leg pinned by a cable against a piece of equipment. As a result, he has a vascular injury to his leg. Dr. Gould, who's treating him, says I'm seeing swelling within the leg. At the time that he releases him, he says you have permanent restrictions of essentially when you're standing for more than two hours, you need to elevate the foot for 45 minutes because if not, the foot swells which leads to pain. He undergoes a functional capacity evaluation, also shows work restrictions. The employer sends him over to Dr. McFadden. Dr. McFadden reviews surveillance films in addition to examining Jamie and essentially agrees with Dr. Gould regarding the permanent work restrictions except he says when he's on his feet for more than two hours, he needs to elevate the leg for an additional two hours. He's essentially a little bit more restrictive than Dr. Gould but essentially they're pretty similar. So what we have is permanent work restrictions being given by both the treating doc and respondent's section 12 examiner. So the commission in decision one has said essentially first prong of AP1 is satisfied. They say petitioner is unable to return to work in the coal mines for the functional capacity evaluation, Dr. Gould's records, and Dr. McFadden's deposition. So AP1 prong one done. What we're talking about is the proof of impairment of earnings. And this is where things become a little confusing, at least for me. The commission in the second decision says Dolores Gonzalez's opinions, and she's the vocational specialist, regarding petitioner's capability to work or the jobs he may be incapable of working are not persuasive. She doesn't really explain what they meant by that because she based her conclusions upon the permanent work restrictions that are undisputed essentially. The commission does go on to, for the sentence right after that, they say the commission says she does not have a valid history of complaints. Well, her vocational conclusions aren't based on complaints, they're based upon permanent work restrictions. It also says, the commission also says Ms. Gonzalez wasn't aware the petitioner had hunted or drove a four-wheeler or had problems driving greater than 90 minutes. Well, none of these are really relevant because all of these issues were already provided to Dr. Gould and Dr. McFadden and they both said, well, this really doesn't go beyond what the permanent work restrictions are. So those are non-issues because, in fact, those are issues that would have been lesser restrictions. So those are really issues that on a vocational level don't make sense as to why they would require that she have this information to come up with permanent work restrictions different from that which Dr. Gould and Dr. McFadden had already identified. And in this situation, Ms. Gonzalez had testified, her vocational conclusions aren't based upon what he tells me. If he tells me I can't do something, she doesn't look at that. She looks at what the permanent work restrictions are and bases her job analysis on what those permanent work restrictions would be. So when we're talking about AD2, what we're really talking about is, is there a loss of earning capacity? And to determine that, we can do it one of two ways. We can either have the employee go back to work or we can do a labor market survey. And so Dolores did do a labor market survey. And in that, she came up with the conclusion that the jobs for him, given his educational past, his vocational past, the work restrictions, the jobs he could hope to find would be $8.50 to $10 per hour as compared to the job at the coal mine which was $30 plus per hour. So that's what she testified to as far as the labor market survey. Now when the commission says Ms. Gonzalez is incredible, they don't say, well, you're labor market survey is wrong. Your rate is wrong because of this. Your area that you searched is wrong because of this. Instead, they attacked her because they said, you didn't know specifically his subjective complaints that would have led to more restrictions. Well, she's saying, I don't do that. They also said, well, you didn't know some of this stuff seen on the surveillance, which she said would also be irrelevant to me. Because if it showed things that would have changed, say, Dr. McFadden, if he had reviewed the surveillance and said, that changed my work restrictions, then she would have considered that. But he didn't. He reviewed the surveillance and his restrictions remained identical. So on a vocational level, she's not being asked to reinvent the medical side of things. Her job is to take the medical conclusion and say, and then determine, first of all, is he employable back where he could be before? We all agree that's not the case. And if he's not, what are the earning capabilities of him? And that's the labor market survey. And there was no contrary opinion by both rehab experts. Correct. You're absolutely right. There was no counter opinion. She was the only opinion on this. And so when the commission said they didn't find her credible, they never really explained why. On a vocational level, they never said, vocationally, she did something wrong on this labor market survey. As it relates to safety one, prong two, to determine the loss of earning capability. So that's where I would say, I think they got it wrong. This is where I'm asking that it be reversed. The arbitrator, at the beginning of all this, identified all of these prongs. I found her to be credible in determining the labor market survey. So when the commission reversed, they're not really explaining why. They're not saying, well, this is wrong on the labor market survey. Or this is wrong on where she looked for work. It doesn't make any sense to me as to why they did it. So that's where I'm saying, I think that their decision is against the manifest weight because it doesn't go to the arbitrator. Because there is no evidence to contradict her, period, you're saying. Correct. It can't be against the manifest weight when there's no counter evidence. Is that what you're saying? In part, yes. And in part because of the fact that the evidence or the testimony that she provided, they never said it was wrong themselves. It's not as though the commission said, well, even though there was no counter opinion, we don't like her. We don't like this. Right. They simply said, well, medically, she doesn't have all the facts. Well, she did. She had both of the doctors with the permanent work restrictions. So if you award the wage differential, the other thing we're asking for is the maintenance. During the time period whenever he had been released by the coal mine, he had looked for 500 different jobs. He turned in the job leads for it. He'd even found jobs with his family where he would work in the springtime, in the fall, doing the harvesting and the planting. So during those time periods in between, he was doing his job search. So we think that the maintenance benefits should be awarded for that time period. When he's working, wage differential. The arbitrator did a great job breaking up each of those time periods when it should have been maintenance versus wage differential. So we're asking that also be reversed and be awarded. Now, one of the other issues that was removed by the commission were the vocational bills from Ms. Gonzalez. Within her testimony, Ms. Gonzalez testified to what her understanding would be for the fees associated with the hourly rate for her services. Now, I know that there was some cross-examination talking about some of it being administrative. And if the court should say, you know, we'll strike the administrative and just do the job search portion of it, I wouldn't have a problem with that because I think there was some confusion with her being able to differentiate those. But to strike the whole thing and to say, well, she doesn't get paid anything even though she had provided vocational services, there was no rational basis for that. There was no information or rational reason or case law cited by the commission as to why this was struck. Did Gonzalez testify that her billing practices met the industry standards? Yes. Did the commission offer any evidence to rebut that testimony? There was no evidence to rebut it. In that regard, I was confused in regards to the Social Security rate. In your brief, you indicated what Department of Labor pays per hour basis. And then you indicated what Social Security pays. But it didn't say per hour. It said $83, $105, $121, $143, depending on the case. Is that per hour? Yes. Yes, that is per hour. My apologies if I didn't make that clear. And the final issue that we have here is the one of penalties. The arbitrator had awarded penalties because in this case it was undisputed by both doctors that he had permanent work restrictions that removed him from his line of work. He had provided the job leads. He had provided all the documentation showing he was looking for work. Yet even all the way up to the day of trial, none of those lost time benefits were paid. That's why we were seeking the penalties. That's why the arbitrator awarded it. And we think that they were wrongly taken away by the commission. So I believe I'm done unless anyone has any questions. I believe there are. Thank you, counsel. We have time in reply.  Counsel? Good morning. May it please the court. Kevin Haislip for the respondent. Right off the bat I was a bit confused by counsel's comments about the FCE and Dr. As I pointed out, had minimal medical treatment. Seven office visits, no physical therapy, no surgery, nothing. He was off work for a year based essentially on swelling at that time for about the year following the accident. And we paid all the benefits. Petitioner's job ended by contract six months after the date of accident. He knew that. And he also knew he would be entitled to long-term disability benefits, which just happened to be in the same amount as TTD benefits. He was able to collect those benefits for two years after his TTD terminated. He collected those benefits, never saw a doctor during those two years, never did anything. All of these job search documents that he provided, all after the fact. They were all produced for one reason, and that's to hand pages and pages of documents to the arbitrator at the time of arbitration. Anyone taking a look at those, at that exhibit, they're not dated. You can tell they're all written at the same time because of the slant that's going down on the page. These documents were produced for one reason and that was it, to give it to the arbitrator. There was no, when I asked him, did you do this, did you call them, did you, he almost, other than his relatives, he didn't go anywhere in person. Those exhibits are essentially worth the paper they're written on. Petitioner had one thing to do here to prove his case. His whole case falls under his subjective statement. When I'm on my feet more than two hours at a time, I get significant swelling and I can't do anything. And that's what Dr. Houle believed just based on what he told him, and that's what Dr. McFadden put in his report based on what Petitioner told him. Dr. McFadden, our examining doctor, suggested way early in the case, after the first exam, let's get an FCE and let's test that leg. Nothing was done. Nothing was done. He gets the FCE after they deposed Dr. Houle twice, and as you know from reading this, it was a standard boilerplate FCE. They didn't do what, one thing to do, test the leg. Well, the FCE, I mean, they did say he put forth good effort, et cetera, et cetera, et cetera. It's valid. And they said he could stand for 41 minutes, walk for 5.43 minutes, and sit for 43 minutes. I mean, all that. Now, they didn't then check the leg for swelling. That's the thing that's out there. Well, they didn't check the swelling, but they didn't test him for two hours on the leg. I mean, he's the one that brought this up, this two hours and the swelling and all that. And, you know, he even went to the extreme of telling Dr. Houle one time, or more than once, I've got pictures of this. Nobody's ever seen those pictures. They didn't bring him to arbitration, never showed him to the doctor. But they had the opportunity then for that FCE, which was done four years after the accident. And just to finish on that, I'm sorry, there was a next day follow-up section of the FCE report, which the evaluator noted that the claimant reported increased swelling in his right lower leg. He's been doing that for four years. But they didn't test him. That FCE should have been done for one thing. Well, I spent $1,800 for an FCE that doesn't accomplish what Dr. McFadden recommended and your own treating Dr. Houle recommended. And then Dr. Houle testified in the second deposition. He admitted, if Petitioner had an FCE which had him on his feet for over two hours and he does not have swelling, his opinion would change. I mean, his opinion as far as his restrictions would change. This was really an easy case. And when I got the FCE report and I looked at it and I said, I just can't believe that we're getting just a standard run-of-the-mill FCEs. There was an easy way to fix all of this. Well, there wasn't an independent evaluation of the question either way on the FCE about the swelling. I mean, it was still based on his report. They had the opportunity to take Dr. Houle and say, okay, here's the FCE, what do you think? And I suspect Dr. Houle would say, well, that doesn't really add much to the equation because this is what we need done and they didn't do that. That's probably why they didn't take his deposition for the third time. But this is a manifest weight question. The Commission just didn't believe the Voc Rehab Specialist, Dolores Gonzalez. They gave several examples in their robbery man decision. Keeping in mind at the beginning, she was brought in in 2008 and if we're going to believe her opinion, why don't we just stick with her first opinion in the case back in 2008, which was, I can't do anything for him, he should go back to college. He should go to college and get a degree. Nothing ever happened with that. Petitioner testified, well, they wouldn't pay for it. They didn't pay for it because the petitioner never asked for it. If they would have been asked for it, it would have gone through me and that's how he had an attorney, that's how it would have happened. That never occurred. That never occurred. He had an opportunity then based on her, where was the labor market survey then? Why does her opinion get to change? Nothing changed in the case. There's nothing I can do for him. No labor market survey, nothing. Go to college. She was under instructions. Evaluate him, write a report, close your file. That's what she testified to, that's what's in the record. And it's only after all of his benefits stop that he goes back to her and again, she starts into this long process. It took over four hours, over two days to take her deposition. Her testimony was just incredible. I mean, she was making comments that as soon as she said them, she knew I shouldn't have said that. She had no information from him. She says, I think he brought me the job search records. Why wouldn't you have a copy in your file? But the petitioner testifies. I didn't show them to her. Well, which is it? There's just so many inconsistencies and it's not just a question of, you know, what is the commission think? The commission, we now know, doesn't believe her and they have problems with the petitioner's credibility also. But it's not a question of, you know, she did a labor market survey and we just focus on that and because of that he's entitled to the benefits. Everything has to be looked at in its proper context here. And her testimony, you know, the fact that she did a labor market survey, why didn't she do it three years earlier? I mean, what really has changed in this scenario that it's now a wage differential case because she was sent back there and she does a labor market survey. How does that prove entitlement to those benefits? The fact that she does a labor market survey, when you read her testimony, she didn't do anything. She was over in Missouri. He's way over in southeastern Illinois. He would go over there, you know, once or twice, but she never came over here. She never went over and assisted with the job searches or anything. This testimony is, I did all these job searches on my own. Well, you know, I mean, you want to knock down her testimony, but I mean, we have an undisputed injury, serious injury, undisputed. He can't go back to that work. If he can't go back to coal mining work, then I think you can certainly infer he can't go back to other heavy type work. You know, we have no contrary opinion by any other voc rehab expert or, I mean, both doctors pretty much agree on the restrictions. Well, the problem is we have, as far as the restrictions, the restrictions are based on an acute situation and Dr. Hu put his restrictions on in one year post-accident. And at that point in time, it's still, you know, if he's at MMI, he's at MMI. But the restrictions are based on his subjective complaints that, you know, he can't stand and he can't do certain things and he needs to have his leg elevated. That was certainly before Dr. Hu saw the videotape and Dr. McFadden saw the videotape and Dr. McFadden saw them for the second time. But when you're dealing with purely subjective complaints and the basis for that, and then take into context a petitioner just took himself out of the labor market, the job search records are just not credible. Anyone who looks at those can tell very quickly they're just not credible. So let's just assume that he didn't go out and he testified. I really didn't go out. I just made phone calls and I looked at the newspaper and I looked online. And he's got no assistance from Ms. Gonzalez for that at all. But it's the totality of it. And when he removes himself from the labor market, because he knows he doesn't have to do anything, he gets a job, he loses long-term disability benefits, which are paying him two-thirds of his average weekly wage, the same he was getting for TTD. Why would you go back to work under those circumstances? It was just a contractual arrangement between the employees of that company and they were entitled to those benefits. And it doesn't matter whether he's seen a doctor or not. It's just, they don't have it anymore, but it was certainly there. There's a lot of incentive not to go back to work, not to look for a job, not to mess with those benefits, and he didn't. And all of this stuff came up about going back to the doctor, getting an FCE, when? Within days of the LTD terminating. And it's just a question of, is it reasonable and is it credible for, when you look at all the facts, that somebody should be entitled to wage differential benefits based solely on a hired vocational specialist who really didn't do nothing, put in 60 or 80 hours at $100 an hour, and when you look at what she did and didn't do, it was really nothing. And she just dumps it off to an associate and gives it to her to work on. But the fact that she did a labor market survey and it shows this and it shows that, that's just a small piece of the puzzle. There has to be, everything has to fit in there and everything has to be credible in there. And the commission just didn't buy it. They thoroughly reviewed her two depositions over four hours, looking at her records, and they just found her to be not credible. And the totality of everything was a petitioner. They found him lacking a lot of credibility. So, and that's why I pointed out in my brief when they submitted their statement of facts to this court, didn't put in any of the cross-examination of the witnesses of the doctors and Ms. Gonzalez. That's, you don't work out cases without discovery. The cross-exam of witnesses is crucial. It's, I mean, it can't be more important. So, you know, sometimes you don't get another vocational specialist simply because what they're offering, as someone who's been around for a long time doing this, it's just not that credible. It's just not believable. I'm the one, I took her deposition and I know that, you know, there were a lot of problems with her testimony. The fact that she gave the testimony and said, I did it, that's part of it. But is it credible based on everything? So, you don't go out and always get a competing opinion when you already know what the answer is going to be. They took Dr. Huli's deposition twice. They decided we're not going to take his deposition after the FCE because chances are cross-examination and Dr. Huli had already testified in his second deposition that he did it and it doesn't show the swelling, my opinion's going to change. And that would have happened. I was going to obviously ask him about that. Doctor, they did this. Your opinion that he shouldn't work because of swelling is based solely on him telling you that. Nobody in this world other than him has ever seen it. And he has all these opportunities to produce it and prove it objectively and he doesn't do it. And for those reasons, this is a manifest wing question. The commission's decision should be affirmed and we ask the court to do that. Thank you, counsel. Counsel, you may reply. Thank you. Wow. The statements that you've heard are very similar to his brief. Their commentaries, their discussions about credibility of witnesses, things of that nature. The one thing that you did not hear from him was her labor market survey was wrong because he doesn't say that the average weekly wage that Jamie would end up with, the $8.50 to $10 is wrong. He doesn't say she looked in the wrong area. He doesn't say that there's anything incorrect with how she performed the labor market survey. That's all we're talking about is prong two of 8D1. He talks about petitioner, well, lacks credibility. Well, if the petitioner lacked credibility, how come the court said we believe the permanent restrictions to be severe enough to remove him from his line of work? They said 8D1 prong one was met. If he wasn't credible and they didn't believe anything that he was selling, they would have said he doesn't meet the criteria. There shouldn't be any work restrictions. And, oh, by the way, speaking of that, this swelling issue, this is the part that has been the part of Commission's decision one, never really even is any issue at trial. The reason being is Dr. Boole at several points in his deposition said, I saw swelling. I documented swelling. It's in his deposition transcript, areas where he had swelling. The other problem with this issue of swelling is if it was a big issue, why didn't Dr. McFadden say, no restrictions until I see swelling? Instead, Dr. McFadden on cross-examination had said, I can still make the work restrictions. I don't need to see the swelling. I can still generate those permanent work restrictions, even without the FCE, even after seeing the surveillance. I still think that there are permanent work restrictions. Work restrictions more severe than Dr. Boole. So the swelling issue is a red herring that they keep throwing out, saying, look, only he's the one that sees swelling. That's simply not true. It's in the record. Dr. Boole documented it throughout the FCE on the next day. He tells the therapist, I have swelling. He testified at trial, I have swelling. Not all the time. When I stand up for long periods, that's when it swells because this isn't an orthopedic injury. It's a vascular injury. The FCE even supports it because he testified that whenever I'm on my feet too long, the foot swells, which causes pain. It's not an orthopedic musculoskeletal. It causes compression within the joint. What happens when he was doing the FCE? After a duration, he felt pain. It's not an orthopedic injury. There's a vascular injury here, so the only way he could be feeling pain is if there's swelling. So you can see throughout all of this that the defense on this hasn't been, we've got a labor market survey that's different. We have a number that's different from what he could be earning. Instead, what they're doing is they're throwing mud. They're saying, Dolores isn't credible because she didn't have all of the permanent work restrictions. Yes, she did. Both doctors. Petitioner's not credible because he doesn't show swelling. Yeah, he did. What else could he do? Should he take pictures every time it swells up so we have 50 pictures of his legs swollen? The doctor testified that it was there. He had testified that it was there. McFadden said, doesn't matter. I can still give permanent work restrictions. It doesn't really matter. The most important part of all of this is they make allegations that essentially Jamie was sitting on his hands waiting for a check. If you see, Ms. Gonzalez actually testified that she believed that he was permanently and totally disabled. Jamie's the person who said, oh, no, no, no. I'm never going to be permanent total. I'm going to find a job no matter what. He did find a job, right? He did. He asked family to help in the planting seasons. He was looking for jobs and was getting interviews with jobs with different positions. He does not want to be permanent total, as Dolores Gonzalez had said. That's why we were asking for wage differential, not permanent total. He's a proud farmer, proud farming family. He doesn't want permanent total, but wage differential is definitely appropriate here. So we would ask that this decision be reversed. Thank you. Thank you, counsel, for your arguments in this matter. I'll be taking under advisement that this position shall issue.